**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DREAMA ADAMS, | ) | |
| | ) | CASE NO.  1:14CV2097 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Dreama Adams ("Adams") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

## I.  Procedural History

In September 2011, Adams filed applications for POD, DIB, and SSI, alleging a disability onset date of July 12, 2011 and claiming she was disabled due to a colon infection, liver infection, and chronic obstructive pulmonary disease ("COPD").  (Tr. 177, 179, 214.)  Her application was denied both initially and upon reconsideration.  (Tr. 137-154.)  Adams timely requested an administrative hearing.

On April 24, 2013, an Administrative Law Judge ("ALJ") held a hearing during which

Adams, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 41-78.)  On June 7, 2013, the ALJ found Adams was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 9-19.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-3.)

## II.  Evidence

### Personal and Vocational Evidence

Age fifty-two (52) at the time of  her administrative hearing, Adams is a "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. § 404.1563(d) & 416.963(d).  Adams has a high school education and two years of college, as well as past relevant work as a nurse's aide, embossing press operator, research assistant, specimen processor, printing press operator, home health aide, and packing machine operator.  (Tr. 17, 45.)

### Relevant Medical Evidence

#### Physical Impairments

On July 21, 2011, Adams presented to Kiran Mohan, M.D., complaining of sudden onset of flu-like symptoms, congestion, and sharp, diffuse abdominal pain.  (Tr. 380-381.)  Dr. Mohan assessed acute sinusitis and prescribed Amoxicillin.  (Tr. 381.)  Adams returned a week later for follow-up, and it was determined her sinusitis had resolved.  (Tr. 383-384.)

On August 3, 2011, Adams was admitted to the hospital after experiencing fever, chills, back pain, nausea, and lethargy.  (Tr. 259-260.)  Adams was "tachycardic with crackles at the base of the lung," and experiencing right upper quadrant pain on palpation.  (Tr. 259.)  A chest-x-ray showed "increased density in the right lower lobe concerning for developing pneumonia," and Adams was started on antibiotics.  *Id.*  Additional diagnostic testing was conducted, including an ultrasound, MRI, and CT scan of Adams' liver.  (Tr. 260.)  The ultrasound showed portal vein thrombosis, while the MRI and CT scan showed "multiple low-attenuation lesions throughout the right lobe of the liver as well as gradual lesions within the left lobe with mere leukothrombosis (right portal vein)."  *Id*.  Testing also showed "mild edema around the distal

2

extending in proximal sigmoid colon which may have represented mild diverticulitis." *Id*.  A CT colonography was also conducted which was suggestive of acute diverticulitis.[1]  *Id*.  Adams was diagnosed with portal vein thrombosis and multiple liver abscesses.  (Tr. 259.)  She was started on IV antibiotics and discharged to a skilled nursing facility on August 17, 2011.  (Tr. 259-260.)

Adams was hospitalized again from September 6, 2011 through September 13, 2011 for treatment of recurrent problematic diverticulitis.  (Tr. 257-258.)  During this stay, Adams was found to have ruptured acute diverticulitis of the colon with percolic abscess formation; chronic diverticulitis; multiple hyperplastic mesenteric lymph nodes; "organized and organizing hepatic abscesses" of the liver; and, stool containing colonic diverticulum. (Tr. 281.)  She underwent a hand-assisted sigmoid colectomy with liver biopsy and colostomy placement.  (Tr. 258.)  Adams was described as doing "very well postoperatively."  *Id*.  She was again placed on IV antibiotics and discharged "back to the nursing facility from which she came in satisfactory condition."  *Id*.

When she was discharged from the hospital to the nursing facility, Adams was advised she could perform activity as tolerated but should not drive or push, pull or lift objects greater than 10 pounds for three weeks.  (Tr. 319.)  By the end of September 2011, Adams was noted as being able to ambulate with a steady gait and empty her colostomy bag with "good technique." (Tr. 290.)  She was also noted as being independent in terms of her ability to bathe, dress, and feed herself.  (Tr. 322.)  Adams was discharged from the nursing facility on September 27, 2011. (Tr. 290, 322.)

On February 8, 2012, Adams underwent a consultative internal medicine examination with Edward Butler, M.D.  (Tr. 330-347.)  Adams reported suffering from emphysema and stated she experienced shortness of breath after walking for ten minutes or "negotiating one flight of stairs."  (Tr. 330.)  She also complained of gastroesophageal reflux disease (GERD);

---

[1]  Specifically, the CT colonography showed "a focal area of mild circumferential wall thickening involving the mild distal sigmoid with numerous colonic diverticula, also showed inflammatory changes involving the diverticulum within the proximal sigmoid colon which may represent acute diverticulitis." (Tr. 260.)

hypertension; chronic headaches; "recurrent cough secondary to smoking;"[2] chest pain with exertion; pain of the elbows and knees; and periodic swelling of the knees and legs.  (Tr. 331.) Dr. Butler recounted Adams' history of hospitalizations and stated "[i]t is hoped that she will have a reversal of her colostomy in 6 to 12 months postoperatively."  (Tr. 330.)

On examination, Dr. Butler found Adams had a normal gait and was able to walk on heels and toes without difficulty.  (Tr. 332.)  He found normal range of motion of her shoulders, elbows, wrists, hip, knees, ankles, and cervical and dorsolumbar spines.  (Tr. 344-347.) While he found Adams' joints to be "stable and nontender," Dr. Butler also noted crepitation at the patellofemoral joints bilaterally.  (Tr. 333.)  With respect to Adams' lungs, Dr. Butler observed a "generalized decrease in breath sounds to auscultation."  (Tr. 332.)  Additionally, he noted Adams had a well-healed scar on her abdomen and a colostomy bag in place.  (Tr. 333.)

Dr. Butler diagnosed asthma; emphysema; GERD, hypertension; status post colostomy for diverticulitis; history of liver abscesses; history of pneumonia; chronic headache; right-sided chest pain (etiology undetermined); and, chondromalacia of the patellas.  (Tr. 333.)  He found Adams' prognosis was "stable" and concluded she should "avoid respiratory irritants."  (Tr. 334.) Finally, Dr. Butler noted that "[t]here are mild limitations to pushing, pulling, lifting, and climbing." *Id.*

Several days later, on February 13, 2012, state agency physician Sarah Long, M.D., reviewed Adams' medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 86-87.)  Therein, she found Adams could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and, sit for about 6 hours in an 8 hour workday.  (Tr. 86.)  Dr. Long also concluded Adams had unlimited push/pull capacity but could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl, due to her colostomy.  (Tr. 86-

---

[2]  Adams reported that she "started smoking cigarettes at 6 years old and smokes half a pack of cigarettes a day."  (Tr. 331.)  She also reported occasional marijuana use. *Id.*

4

87.)  She also found Adams should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  (Tr. 87.)

On February 29, 2012, Adams presented to Harry Reynolds, Jr., M.D., the doctor who had performed her sigmoid colectomy the previous September.  (Tr. 410-411.)   Adams reported that, since her surgery, her appetite had been fair and energy level had been "improving somewhat." (Tr. 410.)  She reported no abdominal pain but stated she "is not really interested in a ostomy closure at this point."  *Id*.  Dr. Reynolds noted Adams had undergone a CT of her abdomen and pelvis in December 2011, which revealed no liver abscesses but did show "multiple hypodensities . . . in both liver lobes, . . . [that] most likely represented cysts."  *Id.*  He encouraged Adams to follow up with Christopher Siegel, M.D., and obtain an MRI for further evaluation.  *Id*.  With respect to a colostomy closure, Dr. Reynolds "felt it would be prudent just to continue to hold off for a bit until we clear up all the liver issues with her."  (Tr. 411.)

 Adams presented to Dr. Siegel the following month.  (Tr. 354-355.)  He noted Adams "appears to be doing relatively well in relation to her recovery from her original surgery." (Tr. 354.)  Dr. Siegel also remarked Adams had undergone an MRI that day but the results were still pending.  *Id.*  Released later that day, the results of the MRI of Adams' abdomen showed inflammatory sites within the hepatic parenchyma had resolved, but there were "multiple nonenhancing fluid collections . . . throughout both hepatic lobes." (Tr. 356-357.)  The radiologist noted "[t]hese may be attributable to sites of former inflammation or may alternatively represent pre-existing cysts." (Tr. 357.)  The MRI also showed thrombosis of the anterior and posterior branches of the right portal vein with interval atrophy of the right hepatic lobe, as well as bilateral renal cysts.  *Id.*

On June 20, 2012, Adams presented to the emergency room complaining of cough, fever, chills, and sore throat.  (Tr. 361.)  A chest x-ray showed mild discogenic degenerative changes in the thoracic spine, but no acute cardiopulmonary process.  (Tr. 360.)  Adams was diagnosed with chronic bronchitis and emphysema; prescribed antibiotics and a short course of steroids; and,

5

discharged home in improved condition.  (Tr. 363.)  Examination on June 26, 2012 showed Adams had no cough and her lungs were clear.  (Tr. 398-399.)

On August 2, 2012, state agency physician Lynne Torello, M.D., reviewed Adams' medical records and completed a Physical RFC Assessment.  (Tr. 111-113.)  Like Dr. Long, Dr. Torello found Adams could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and, sit for about 6 hours in an 8 hour workday.  (Tr. 111.)  Dr. Torello also concluded Adams had unlimited push/pull capacity but could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl, due to her colostomy.  (Tr. 112.)  Dr. Torello, however, ascribed greater environmental limitations than Dr. Long, finding Adams should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  (Tr. 112-113.)

On October 31, 2012, Adams returned to Dr. Reynolds for examination in preparation of a colostomy closure.  (Tr. 408-409.)  Dr. Reynolds found Adams was "clinically doing well" and "should be a candidate for closure of her colostomy."  (Tr. 408.)  He felt it would be prudent, however, to first refer her for a colonoscopy.  (Tr. 408-409.)  Adams underwent a colonoscopy on November 29, 2012, after which she was cleared for the closure procedure.  (Tr. 435-436.)

On December 4, 2012, Adams was admitted to the hospital and underwent a colostomy closure.[3]  (Tr. 430.)  Adams "tolerated the procedure well" and was returned to the regular nursing floor for postoperative care.  (Tr. 431.)  However, several days later, Adams developed a fever and "persistent leukocytosis."  *Id.*  She was treated with antibiotics for a urinary tract infection and "developing pneumonia."  *Id.*  In addition, her midline wound was "erythematous and concerning for infection" and, therefore, was reopened and cultured.  *Id.*  The wound culture showed bacterial growth and Adams' antibiotic coverage was broadened.  *Id.*  When Adams continued to have persistent leukocytosis, she underwent a CT scan, which showed "free fluid,

_____

[3]  Specifically, Adams underwent a "diagnostic laparoscopy with laparotomy and takedown of descending colostomy, takedown of splenic flexure, and colorectal anastomosis."  (Tr. 430.)

6

partially loculated, within the pelvis." *Id.*  The fluid was drained and Adams was continued on IV antibiotics twice daily.  *Id.*  Adams was discharged home on December 17, 2012 with instructions for wound care, home-going antibiotics, and home nursing visits.[4]  (Tr. 431-432.)

On January 19, 2013, Adams presented to the emergency room for treatment of abdominal pain and discharge from her umbilical wound.  (Tr. 427-428.)  The attending physician noted Adams "did have a complicated postop course," including "large wound infection."  (Tr. 427.)  Adams was treated with gauze and pain control, and discharged the same day in stable condition.  (Tr. 428.)

On February 6, 2013, Adams returned to Dr. Reynolds for a "wound check."  (Tr. 416.) Dr. Reynolds observed that "things have closed up, but she still has some fullness just below the umbilicus" and "I can feel that there is some pus below this." *Id.*  He then opened "about a centimeter" of the wound and discovered "purulent material." *Id.*  Dr. Reynolds determined Adams had a wound infection. *Id.*  He drained and packed her wound but did not feel it was necessary to prescribe antibiotics. *Id.*  Dr. Reynolds advised Adams to return in a month. *Id*.

Adams returned to Dr. Reynolds on March 27, 2013.  (Tr. 415.)  Adams reported a fair appetite, no significant abdominal pain, regular bowel movements, and "some rare nausea" but no vomiting. *Id*.  Dr. Reynolds observed Adams' wound was well healed and "[s]he is clinically doing well." *Id*.  He also noted Adams "has recovered from her surgery" and was having "no further problems" with wound infection. *Id*.  He indicated he would see her on an as-needed basis and advised that she consider a colonoscopy in about ten years. *Id.*

### Mental Impairments

On July 10, 2012, Adams underwent a consultative psychological evaluation with David House, Ph.D.  (Tr. 401-407.)  Adams reported "she has friends, attends church 'sometimes,' and

---

[4] While at the hospital, Adams was also treated for a hand injury.  (Tr. 431.)  X-rays of her right wrist showed fracture at the fifth metacarpal.  *Id.*  She was examined by the hospitals' "hand team" and her hand was placed in a splint.  *Id.*

. . . is active in the community, at least to some degree, 'in a youth program.'" (Tr. 402.)  She indicated she used cannabis to improve her appetite, and had last used it "a few months ago."  *Id*.  In terms of her past mental health history, Adams reported "she had been hospitalized at some point when she was in her 20s" and had received counseling at about the same time.  (Tr. 403.)  She indicated she had tried Zoloft in the past but discontinued it because it gave her "violent thoughts."  *Id.*

With regard to her current mental health status, Adams reported she was depressed and "under stress."  (Tr. 403.)  She cried during the examination, and stated she had been having crying episodes "a lot lately."  (Tr. 403-404.)  She claimed she had never attempted to kill herself, but reported thinking "that she might be better off not being alive."  *Id*.  Adams further stated she had been abused as a child and "relives those episodes and goes through mood swings 'from sad to angry.'"  *Id*.  She reported frequent shortness of breath and stated she did not go out because of her health problems.  *Id*.  Adams also complained that she slept only three hours per night, and had lost a significant amount of weight since her surgery in 2011.  *Id*.

On examination, Dr. House observed Adams' grooming and hygiene appeared adequate, and she was able to ambulate without difficulty.  *Id*.  She was "subdued in manner" and rated her energy level as "low."  *Id*.  Dr. House observed no loose associations or tangential speech, but found "some levels of circumstantiality . . . along with mild pressure to her speech."  *Id*.  He also found Adams' "pace seemed broadly adequate [and] she was generally persistent, although she had mild difficulties completing the examiner's tasks," including an inability to subtract serial 7s and interpret a common proverb.  (Tr. 404-405.)  Dr. House went on to note that, despite her limitations, Adams was able to do yard work, read, talk on the phone, and play word games.  (Tr. 405.)  He observed that Adams complained, several times, about being forgetful and "leaving her purse from place to place."  *Id*.

Dr. House diagnosed Adams as follows:

Based upon the information gathered during testing and interview session, it is

8

> my opinion, with reasonable scientific certainty, that Dreama Adams would suffer
> from a diagnosis of Major Depressive Disorder, Severe, Recurrent, currently.
> Depression is without psychotic features. She is abusing cannabis and is
> experiencing anxiety.  Post traumatic stress symptoms are mild to moderate, at
> least on the surface.  Her major difficulty relating to her affective state is
> interruptions in her concentration and attention and her forgetfulness.  Her
> conditions appears chronic. She has been through at least two depressive
> episodes.

(Tr. 405.)  In terms of his functional assessment, Dr. House concluded Adams' long and short

term memory were fair, and her concentration and attention were "somewhat variable."  (Tr.

406.)  He found that she "seems capable of being cooperative with coworkers and/or

supervisors" and noted further that "it seems that she did not have any history of any major

difficulties interacting with others and had spent most of her work career as a caregiver."  *Id.*

Lastly, with regard to Adams' ability to respond to work pressures, Dr. House found that:

> She is having some difficulties currently coping with stress and her emotional
> resources and coping skills are reduced. It would seem that her difficulty is
> manifested through forgetfulness and it is the examiner's opinion that she would
> be disruptive and dysfunctional in a work environment, at least currently and
> likely simply would not show up.

(Tr. 406.)

Dr. House assessed a Global Assessment of Functioning[5] of 45, which he stated "is

based on serious interruptions in terms of concentration and recent thoughts of death and what

appears to be serious impairment emotionally in employability currently."  *Id.*  With regard to

Adams' prognosis, Dr. House found that "likely she would do better as her physical health

improves and she receives some further psychological or psychiatric treatment."  (Tr. 407.)

----

[5] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.
*Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric
Association, 4th ed. revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0-100,
with lower numbers indicating more severe mental impairments.  A GAF score between 41-50
indicates serious symptoms or any serious impairment in social, occupational or school
functioning.  DSM-IV at 34.  It bears noting that a recent update of the DSM eliminated the
GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16
(American Psychiatric Association, 5th ed., 2013).

On July 26, 2012, state agency psychologist Paul Tangeman, Ph.D., reviewed Adams' records and completed a Mental RFC Assessment.  (Tr. 113-115.)  He concluded Adams was not significantly limited in her abilities to remember locations and work-like procedures, and understand and remember very short and simple instructions.  (Tr. 113.)  However, he found Adams was moderately limited in her ability to understand and remember detailed instructions and concluded she could only complete "simple one to two step tasks."  *Id.*  In addition, Dr. Tangeman offered that Adams was moderately limited in her abilities to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; and, (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 114.)  In particular, he noted Adams "can complete tasks that do not involve extended periods of attention, concentration or more than daily planning."  *Id.*

With regard to Adams' social interaction limitations, Dr. Tangeman found Adams was not significantly limited in her abilities to interact appropriately with the general public; ask simple questions or request assistance; or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 114.)  However, he concluded she was moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors; and, get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  *Id.*  In this regard, he noted Adams "should not be required to influence others to follow instructions, demands, or handle criticism."  *Id.*

With regard to Adams' adaptation limitations, Dr. Tangeman opined Adams was moderately limited in her ability to respond appropriately to changes in the work setting, but was not significantly limited in her abilities to be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; or set realistic goals or make plans independently of others.  (Tr. 115.)  Specifically, he found Adams "can complete tasks

10

where there is no more than occasional change; and when change occurs it can be explained in simple terms." *Id.*

Finally, Dr. Tangeman acknowledged Dr. House's opinion was more restrictive than his but stated Dr. House's opinion was "an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." *Id.*

Aside from Dr. House's and Dr. Tangeman's opinions, the parties do not direct this Court's attention to any other medical records regarding Adams' mental impairments.

### *Hearing Testimony*

During the April 24, 2013 hearing, Adams testified to the following:

- She completed two years of a four-year college special education program.  (Tr. 45.)  She has worked in numerous jobs over the years.  She has been a nurse's aide; printing machine operator; press operator; packing machine operator; group home worker; blood processor for a dialysis unit; and, a research assistant.  (Tr. 47, 49-57.)

- She stopped working in 2011 because she was "nauseated, lightheaded, out of breath, lethargic, running temperatures, and [having] hot and cold flashes."  (Tr. 47.)  These symptoms were caused by "over 100 abscesses on my liver," a clot in the main caudal vein to her liver; perforation of her intestine; and, diverticulitis.  (Tr. 48.)  She had surgery for these conditions in August 2011 and December 2012.  (Tr. 48, 61-62.)

- She has not been doing well since her surgeries.  (Tr. 48, 61-62.)  Her incision became infected and had to be reopened three times.  (Tr. 61-62.)  She underwent four months of antibiotic IV therapy; as well as numerous colonoscopies, MRIs, and CT scans.  *Id.*

- Additionally, as a result of her August 2011 surgery, she had to use a colostomy bag.  (Tr. 65.)  It smelled bad and had to be changed frequently.  (Tr. 65-67.)  She felt very self-conscious and isolated herself.  *Id.*  Her colostomy was reversed in December 2012.  (Tr. 67.)  Since then, she urinates more frequently and has not been sleeping well.  *Id.*

- She has had a decrease in her appetite, and lost a significant amount of weight.  She went from a size 16 in 2011 to a size 5 at the time of the hearing.  Her doctors want her to stop losing weight.  She has been advised to eat six small meals a day to stimulate her appetite.  (Tr. 48-49.)

- She has arthritis in her knees, for which she has been referred for physical therapy.  (Tr. 62-63.)  She broke her right wrist in December 2012 and is still wearing a brace "to get my fingers to straighten back up."  (Tr. 46.)  She is undergoing occupational therapy for her right hand.  (Tr. 63.)  She also suffers

from chronic headaches. (Tr. 64.) She experiences headaches "more than once a week" and they sometimes last "for days." *Id.* When she gets a headache, she has to lay down and avoid light and sounds. *Id.* She takes Tramadol and Tylenol for her headaches. *Id.* She also suffers from COPD. *Id.*

• She experiences panic attacks once or twice a month as a result of stress. (Tr. 65.)

• She is not currently able to work because her "strength is not the same" and her "energy level is low." (Tr. 57.) She is "not moving at the same rate that [she] was before," and it takes her longer to do things. (Tr. 48, 57.) She experiences shortness of breath when she walks too much or uses the stairs. (Tr. 58.) Standing for prolonged periods bothers her legs, back, and shoulders. (Tr. 57-58.) She also has "foggy" thinking, which she described as not remembering things. *Id.*

• She can stand for thirty minutes before needing to sit down. (Tr. 60-61.) She can walk for one block, or approximately 20 to 30 minutes, before needing to rest. (Tr. 61.) She can sit for thirty minutes before needing to change positions. *Id.* She also loses things, such as her purse. *Id.*

• She cooks and goes to the grocery store. (Tr. 59.) She tries to vacuum, but it takes longer than it used to. (Tr. 58.) Her son does the mopping and his own laundry. *Id.* He helps her with her laundry because it is difficult for her to use the stairs. *Id.* She does not go to the mall, restaurants, or to church. (Tr. 60.) The only place she goes is to her doctor appointments, as well as occasional trips to the grocery store. *Id.* She watches television and has been starting to read again. (Tr. 59-60.) Friends come to visit her sometimes. (Tr. 60.)

The VE testified Adams had past relevant work as a home health aide, personal; packing machine operator; research assistant; specimen processor; embossing press operator; nurse aide; and, printing press operator. (Tr. 71-72.) The ALJ then posed the following hypothetical:

[I]f you would consider a person of the Claimant's age, education, and past relevant work experience with a capacity for light work, with climbing stairs, ramps occasionally; climbing ladders, ropes, scaffolds occasionally; balancing, stooping, kneeling, crouching, crawling, all occasionally; who would have to avoid even moderate exposure to fumes, dusts, odors, and so forth; with the capacity to complete simple one-to-two step tasks; and the capacity to complete tasks that do not involve extended periods of attention, concentration, or more than daily planning; and who should not be required to influence others to follow instructions, or follow demands, or to handle criticism; but who has the capacity to complete tasks where there is no more than occasional change, and when change occurs it could be explained in simple terms. Would such a person be able to perform any of the jobs the Claimant performed in the past?

(Tr. 72-73.)

The VE testified such a person would not be able to perform any work because "[a]nyone

12

leaving the house is exposed to moderate odors, dust, fumes and gases." (Tr. 74.)  The ALJ then modified the above hypothetical to concentrated exposure to fumes, dusts, and odors.  (Tr. 75.) The VE responded such a claimant could not perform Adams' past relevant work, but could perform other jobs in the national and local economy, including packager (light, unskilled, SVP 2); mail clerk (light, unskilled, SVP 2); and, small products assembler (light, unskilled, SVP 2). (Tr. 75-76.)

Adams' counsel then asked whether "the individual, for the jobs that you identified in hypothetical two, could maintain those jobs or other jobs if they were going to be off task for about 15 minutes of every hour."  (Tr. 76.)  The VE testified "that's tantamount to 25 percent being off task, and in my opinion that person would be non-competitive, therefore there would be no work."  *Id.*  Adams' counsel also asked the VE to address employer tolerance for "chronic absences at the unskilled level."  (Tr. 77.)  The VE testified that an unskilled employee with two or more absences per month would be precluded from work.  *Id.*

Finally, Adams' counsel asked the VE to describe an employer's "general tolerance for additional unscheduled breaks. . . at the unskilled level."  (Tr. 76.)  The VE testified that anything beyond a mid-morning, lunch, and mid-afternoon break "is at first a concern, then a flag, and if it becomes chronic, would preclude work."  *Id.*

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[6]

---

[6]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful

13

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and, (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Adams was insured on her alleged disability onset date, July 12, 2011, and remained insured through the date of the ALJ's decision, June 7, 2013. (Tr. 9.) Therefore, in order to be entitled to POD and DIB, Adams must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Adams established medically determinable, severe impairments, due to inflammatory bowel disease, COPD, anxiety, and affective disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 11-13.) Adams was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 13-17.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a

---

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

framework and VE testimony to determine that Adams was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *RFC*

Adams argues the ALJ erred in finding she had the residual functional capacity to perform a reduced range of light work because he relied on "outdated opinions from one examining physician and two reviewing physicians which were offered before Ms. Adams' colostomy closure and wound infection."  (Doc. No. 13 at 9.)  She maintains "the record does not contain a treating medical source opinion and the records, after [Dr. Torello's] August 2, 2012 reviewing physician opinion, were left as raw data which the ALJ was not qualified to interpret to determine Ms. Adams' RFC."  *Id.*  Adams maintains that, because the medical opinions regarding her physical limitations were "outdated," the ALJ was required to further develop the administrative record by obtaining an "updated medical opinion" to "help provide necessary medical evidence to evaluate Ms. Adams' subjective symptoms and credibility after her colostomy revision and infection."  *Id.* at 11.

The Commissioner argues the ALJ was not obligated to obtain updated medical opinions

16

following Adams' colostomy closure procedure.  She notes Adams was represented by counsel in the administrative proceedings below and "never argued that the record was deficient."  (Doc. No. 16 at 10.)  The Commissioner further argues the records subsequent to Dr. Torello's August 2012 opinion were not simply "raw data" but, "rather, included narrative summaries in plain English that the ALJ could reasonably assess."  *Id.* at 11.  She asserts these records, in fact, establish Adams underwent a successful colostomy closure procedure in December 2012; her recovery was complicated by a wound infection; and, her wound infection had resolved by March 2013.  *Id.*  The Commissioner further maintains the physical RFC was entirely consistent with "every medical source of record" and supported by substantial evidence.

The RFC determination sets out an individual's work-related abilities despite established limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence.  *See* 20 C.F.R. § 416.946(c).  "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence."  *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

Here, the ALJ considered the hearing testimony and medical evidence regarding Adams' colostomy procedures/irritable bowel disease and COPD, as well as her major depressive disorder and anxiety disorder.  (Tr. 15.)  The ALJ went on to find that Adams' medically determinable impairments could reasonably be expected to cause her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible" in light of her work history; activities of daily living; history of non-

compliance (*e.g*., evidence that she failed to attend a follow-up appointment, exhibited poor

effort during a breathing test, and continued to smoke despite her COPD); and, treatment records

showing she had recovered from her colostomy surgeries. (Tr. 15-16.)

The ALJ then considered the opinion evidence. With regard to Adams' physical

impairments,[7] the ALJ assessed the opinions of Drs. Butler, Long, and Torello as follows:

> In terms of the claimant's physical impairments, Dr. Butler receives great weight
> for his examining opinion that the claimant should avoid respiratory irritants and
> has mild limitations for pushing, pulling, lifting and climbing. (Exhibit 4F/5).
> The doctor tested the claimant's range of motion, strength, and breathing ability.
> (Exhibit 4F). His stable prognosis for the claimant is also supported by the
> improvement noted in the medical record, including the results of the claimant's
> colostomy procedures. (Exhibit 12F/1).
>
> The state agency consultants receive some weight for restricting the claimant to
> light work with occasional posturals. (Exhibits 2A; 4A; 6A; 8A). The evidence
> regarding the claimant's abdominal pain and breathing difficulties supports such a
> restriction. However, the consultants additionally stated that she must avoid even
> moderate exposure to fumes, odors, dusts, and poor ventilation. (Exhibits 2A;
> 4A; 6A; 8A). The vocational expert testified that anyone who leaves their home
> is exposed to moderate respiratory irritants. The claimant testified that she leaves
> her home and continues to expose herself to irritants in cigarettes and marijuana
> smoke. Therefore, a more appropriate restriction is to avoid concentrated
> exposure to respiratory irritants.

(Tr. 16.) The ALJ then formulated the RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b) except: She can climb stairs, ramps, ladders,
> ropes, and scaffolds occasionally. She can balance, stoop, kneel, crouch, and
> crawl occasionally. She must avoid concentrated exposure to fumes, dust, gases,
> and other respiratory irritants. She has the capacity to complete simple, one to
> two step tasks. She has the capacity to complete tasks that do not involve
> extended periods of attention, concentration, or more than daily planning. She
> should not be required to influence others to follow instructions, demands, or
> handle criticisms. She has the capacity to complete tasks where there is no more
> than occasional change. When change occurs it must be able to be explained in
> simple terms.

(Tr. 13.)

---

[7] As this assignment of error relates to the physical limitations set forth in the RFC, the ALJ's
assessment of the medical opinions regarding Adams' mental limitations is not set forth
above. Rather, these opinions will be discussed in connection with Adams' second
assignment of error, *supra.*

As noted *supra*, Adams argues the above RFC is not supported by substantial evidence because it is based on "outdated" opinions of Drs. Butler, Long, and Torello that "did not consider a critical body of evidence relating to Plaintiff's colostomy reversal and infection." (Doc. No. 13 at 10.) Adams maintains the ALJ had a duty to further develop the record by obtaining a more current medical opinion regarding her physical functional limitations.

In the Sixth Circuit, it is well established that the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim. *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed. App'x. 456, 459 (6th Cir. 2008) (citing 20 C.F.R. § 404.1512(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."); *cf. Wright–Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of his employment when his past work was part of the record and was the basis of the initial decision to deny benefits). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson,* 280 Fed. App'x. at 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)).

In the case at bar, it is undisputed that Adams was represented by counsel at the hearing (Tr. 9) and, therefore, the ALJ had no heightened duty to develop the record. However, relying on *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908 (N.D. Ohio 2008) and *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), Adams argues the ALJ nonetheless

19

erred in failing to obtain updated medical opinions because medical records post-dating the 2012
opinions of Drs. Butler, Long and Torello "were left as raw data which the ALJ was not qualified
to interpret to determine Ms. Adams' RFC." (Doc. No. 13 at 9.)  In *Deskin*, the ALJ found the
claimant suffered from the severe impairments of degenerative disc disease and fibromyalgia.
*Deskin*, 605 F.Supp.2d at 909.  None of Deskin's treating physicians provided a medical opinion,
despite an extensive treatment history.  *Id*. at 910.  Rather, the sole medical opinion in the record
was that prepared by a state agency reviewing physician.  *Id.*  The record before the ALJ,
however, contained two years of medical records post-dating the state agency physician's
opinion.  *Id.*  The ALJ did not order a consultative examination or have a medical expert testify
at the hearing and, instead, "proceeded to decide the case on his analysis of the medical records,
giving only passing mention to [the state agency physician's] opinion."  *Id.*

The Court determined the RFC was not supported by substantial evidence "because of the
absence from the administrative record of a proper medical opinion as to Deskin's work-related
limitations."  *Id.* at 910.  The Court explained as follows:

> While acknowledging that the ALJ has discretion on whether to order a
> consultative examination or call a medical expert at the hearing, nevertheless,
> bottom line, the ALJ's ultimate residual functional capacity finding must have
> the support of substantial evidence in the administrative record.  **Where the ALJ
> proceeds to make the residual functional capacity decision in the absence of a
> medical opinion as to functional capacity from any medical source, or, as
> here, with one made without the benefit of a review of a substantial amount
> of the claimant's medical records, there exists cause for concern that such
> substantial evidence may not exist.**
>
> Ultimately, at step four of the sequential evaluation process, the ALJ must
> determine how the claimant's severe impairments translate into work-related
> capabilities or limitations. This is the residual functional capacity finding against
> which the claimant's ability to perform his or her past relevant work, or other job
> existing in significant numbers locally or nationally, is gauged.
>
> Critical to this residual functional capacity finding are residual capacity opinions
> offered by medical sources such as treating physicians, consultative examining
> physicians, medical experts who testify at hearings before the ALJ, and state
> agency physicians who reviewed the claimant's medical records.  In making the
> residual functional capacity finding, the ALJ may not interpret raw medical data
> in functional terms.

*Id.* at 911-912 (footnotes omitted)(emphasis added).

That being said, the Court acknowledged that "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Id.* at 912. Thus, the Court held as follows:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Id.* at 912. Because the post-state agency physician opinion record before the ALJ in *Deskin* contained "extensive MRI findings of diffuse and substantial degenerative disc disease throughout Deskin's spine," the Court found the ALJ erred in failing to obtain "the opinion of a medical source to assist in the translation of the raw medical data . . . into functional limitations." *Id.* at 913.

*Deskin*, however, has been criticized by other judges within this District.[8] In *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222 at * 2 (N.D. Ohio March 2, 2010) (Nugent, J.), the Court found that "*Deskin* . . . is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." The Court further explained:

> The statute and regulations setting forth the procedure and criteria for the ALJ's decision require the ALJ to determine whether there is a medically determinable impairment, to review objective evidence, review listed impairments, and then determine the issue of medical equivalence of the applicant's symptoms or condition. 20 C.F.R. § 416.920a(c)(1), Pt. 404, Subpt. P., App. 1, and 416.925(e).
>
> The ALJ, not a physician, is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole. 42 U .S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c). Pursuant to the regulations, the ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence

---

[8]Neither party cited this countervailing authority, or otherwise directed the Court's attention to this intra-district split.

21

> (not limited to medical opinion testimony), and the claimant's testimony. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629 633 (6th Cir. 2004); SSR 96–5p, SSR 96–8p. The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2).
>
> The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence. *See, e.g., Ford v. Comm'r of Soc. Sec.,* 114 F.App'x 194 (6th Cir. 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058, at (6th Cir. Aug.18, 2009). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 2009 WL 2514058 at *7. Although the ALJ discounted the testimony of the doctors who proposed widely varying ranges of limitations, and found Ms. Henderson to not be fully credible in her testimony as to her limitations and abilities, he was within a clearly appropriate "zone of choice" to find that the testimony (even if not all fully credible) suggested some limitation was appropriate. *See, Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

*Id*. at *2. Other courts within this District have also declined to follow *Deskin*. *See e.g. Jackson v. Comm'r of Soc. Sec.*, 2014 WL 2442211 at * 6 (N.D. Ohio May 30, 2014) (McHargh, M.J.); *Williams v. Astrue*, 2012 WL 3586962 at * 7 (N.D. Ohio Aug. 20, 2012)(Vecchiarelli, M.J.); *Strimpel v. Astrue*, 2012 WL 4060744 at * 9 (N.D. Ohio Sept. 14, 2012) (Vecchiarelli, M.J.).

Subsequently, the judge that authored *Deskin* defended the holding in that case and distinguished *Henderson* on its facts. *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011) (Baughman, M.J.). The Court then explained the scope of *Deskin* as follows:

> Properly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test. It potentially applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence. The ALJ retains discretion to impose work-related limitations without a proper source opinion where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Id*. at * 2 (footnotes omitted).

The Court need not decide whether to adopt *Deskin* as clarified in *Kizys* because the instant case falls outside the "narrow rule" set forth in those decisions. In particular, Adams has not demonstrated that the RFC is flawed because of a "critical body of objective medical evidence" post-dating the medical source opinions considered by the ALJ. As discussed *supra*,

the ALJ fully considered the medical source opinions of Drs. Butler, Long, and Torello regarding Adams' physical abilities.[9]  The most recent of these opinions is the August 2, 2012 opinion of state agency physician Dr. Torello.  (Tr. 111-113.)  Subsequent to this opinion, Adams underwent a colostomy reversal procedure in December 2012 and was treated for wound infection in January and February 2013.  (Tr. 430-431, 427-428, 415-416.)  The last medical record identified by the parties relating to Adams' physical impairments is Dr. Reynolds' March 27, 2013 treatment note.  (Tr. 415.)  In this note, Dr. Reynolds states Adams had "recovered from her surgery;" was having "no further problems" with wound infection; and was "clinically doing well."  *Id.*

    While Adams correctly notes that approximately ten months elapsed between Dr. Torello's opinion and the ALJ's decision, she has not demonstrated that the additional records regarding Adams' colostomy closure and subsequent treatment for wound infection so changed the medical evidence regarding her physical impairments that it rendered Dr. Torello's opinion outdated.  Although Adams' wound became infected after the closure procedure, Dr. Reynolds' treatment notes indicate this problem was resolved by March 2013 and that, at that point, Adams had recovered from her surgery.  (Tr. 415.)  The ALJ acknowledged these records in the decision, and expressly discussed the "more recent evidence" showing Adams had recovered and was clinically well.  (Tr. 15.)  While Adams asserts summarily that the records regarding her colostomy closure and wound infection constitute "raw medical data" that the ALJ was not qualified to interpret, the Court disagrees.  Dr. Reynolds' treatment notes are written in narrative form and clearly convey the nature of Adams' colostomy closure procedure, as well as her condition, treatment, and recovery thereafter.

    Moreover, Adams does not explain why she believes these records would require review through an updated medical opinion in light of the fact that the colostomy closure procedure was

---

[9] Notably, Adams does not argue the ALJ improperly evaluated any of these opinions.

23

successful and her wound infection was fully resolved by March 2013.  The Court also notes

that, unlike *Deskin*, less than one year of medical evidence followed the final state agency

review of Adams' medical records.  Other courts have declined to remand for updated medical

opinions under similar circumstances.  *See e.g. Jackson*, 2014 WL 2442211 at * 7-8

(distinguishing *Deskin* on the grounds that less than one year of medical evidence followed the

final state agency review of claimant's medical records and that evidence showed some

improvement); *Raber v. Comm'r of Soc. Sec.*, 2013 WL 1284312 at * 17 (N.D. Ohio March 27,

2013) (distinguishing *Deskin* because "the evidence related to [Raber's] condition after the

consultative review covered roughly eleven months and showed she was reporting improvement

or relief through treatment and did not want surgery.")

Furthermore, the Court notes that "an ALJ is not required to refer a claimant for a

consultative examination unless the record establishes that such an examination 'is necessary to

enable the administrative law judge to make the disability decision.'"  *Williams v. Astrue*, 2012

WL 3586962 at * 8 (N.D. Ohio Aug.20, 2012) (quoting *Landsaw,* 803 F.2d at 214)).  Pursuant to

20 C.F.R. § 404.1519a(b), a consultative examination may be purchased "to try and resolve an

inconsistency or when the evidence as a whole is insufficient to support a determination or

decision ..."  However, "[t]he plain language of the statute clearly places the decision to order a

consultative examination within the discretion of the ALJ."  *Evans v. Astrue*, 2010 WL 5488525

at * 5 (E.D. Tenn. Nov.22, 2010), *report and recommendation adopted*, 2011 WL 13453 (E.D.

Tenn. Jan. 4, 2011); *see also Lucas v. Comm'r of Soc. Sec.,* 2013 WL 1150019 at * 1 (N.D. Ohio

Mar. 19, 2013) ("Ordering a consultive exam lies in the discretion of the ALJ."); *Cyrus v.

Astrue*, 2012 WL 2601495 at * 8 (S.D. Ohio July 5, 2012) ("Whether or not to order a

consultative examination is a discretionary decision made by an ALJ upon a finding that the

record is not sufficiently developed to evaluate a claim."), *report and recommendation adopted*,

2012 WL 3113224 (S.D. Ohio July 31, 2012); *Lockett v. Comm'r of Soc. Sec.*, 2012 WL 3759037

at * 4 (E.D. Mich. Aug.1, 2012) ("The determination to order a consultative examination or

diagnostic testing is entirely discretionary ...”), *report and recommendation adopted*, 2012 WL 3731772 (E.D. Mich. Aug.29, 2012). Here, Adams has not demonstrated that a consultative examination was necessary to enable to the ALJ to make the disability decision, particularly in light of her successful colostomy closure and the resolution of her wound infection.

Finally, although not identified as a separate assignment of error, Adams appears to argue the ALJ erred in failing to credit her hearing testimony that “she does not move at the same pace and it takes her longer to do things, she can stand 30 minutes, walk 20 to 30 minutes, and sit 30 minutes, she tries to vacuum, cooks and does limited grocery shopping, but needs help with laundry and mopping, and that she has difficulty focusing on reading and loses track of items.” (Doc. No. 13 at 11.) Adams asserts, summarily, that “the ALJ found her generally credible, but rejected [the above] testimony of disability primarily on the basis of the raw data.” *Id*.

Credibility determinations regarding a claimant’s subjective complaints rest with the ALJ. *See Siterlet v. Sec’y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ’s credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec’y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, “[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight.” SSR 96-7p, Purpose section; *see also Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994) (“If an ALJ rejects a claimant’s testimony as incredible, he must clearly state his reason for doing so”).

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96–7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ

should consider.[10]  The ALJ need not analyze all seven factors, but should show that he

considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.,* 373 F.Supp.2d 724, 733

(N.D. Ohio 2005); *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

>   Here, the ALJ evaluated Adams' credibility as follows:

>   After careful consideration of the evidence, the undersigned finds that the
>   claimant's medically determinable impairments could reasonably be expected to
>   cause the alleged symptoms; however, the claimant's statements concerning the
>   intensity, persistence and limiting effects of these symptoms are not entirely
>   credible for the reasons explained in this decision.

>   The claimant's work history, treatment record, and activities of daily living
>   support the residual functional capacity.  She last worked in 2011 for two days
>   after her alleged onset of disability.  (Exhibit 1E/7).  The claimant has a relatively
>   strong work history, which generally supports her credibility. (Exhibit 4E).
>   However, the medical records reveal noncompliance.  The claimant failed to
>   attend a follow-up appointment after her abdominal surgery.  (Exhibit 5F/2).  She
>   then demonstrated poor effort during a consultative breathing test.  (Exhibit
>   4F/10).  Dr. Butler found the test invalid.  (Exhibit 4F/10).  Additionally, the
>   claimant continued smoking cigarettes and marijuana despite her complaints of
>   breathing difficulties.  (Exhibit 5F/2). The medical records also reveal that the
>   claimant recovered from her colostomy surgeries. (Exhibit 12F/1).  Dr.
>   Reynolds's March 2013 report indicates that the claimant does not need to return
>   unless other colorectal surgical issues arise.  (Exhibit 12F/1).  The claimant's
>   activities of daily living also support the residual functional capacity.  She
>   testified that she drives, shopes in grocery stores, and is raising her 14-year old
>   son.  These activities reflect an ability to sit, stand, walk, and lift at the light
>   exertional level.  The claimant also admitted to watching television, reading
>   books, and playing games.  (Exhibit 9F/5).  These entertainment options support
>   some ability to concentrate.

(Tr. 16.)

>   The Court finds the ALJ did not improperly assess Adams' credibility.  In the four

sentences Adams devotes to this "argument," she does not assert the ALJ failed to articulate

---

[10]    The seven factors are: (1) the individual's daily activities; (2) the location, duration,
frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate
the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the
individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than
medication, the individual receives or has received for relief of pain or other symptoms; (6) any
measures other than treatment the individual uses or has used to relieve pain or other
symptoms; and (7) any other factors concerning the individual's functional limitations and
restrictions due to pain or other symptoms. *See* SSR 96–7p, Introduction.

specific reasons for finding her to be "not entirely credible," nor does she argue that any of the reasons articulated by the ALJ in his credibility analysis are not supported by substantial evidence.  The only objection articulated by Adams is that the ALJ "rejected her testimony of disability primarily on the basis of the raw data."  (Doc. No. 13 at 11.)  As discussed above, the Court disagrees that the medical evidence regarding Adams' closure procedure and subsequent, successfully treated wound infection constitutes "raw data" that the ALJ was not qualified to interpret.  The ALJ fully considered the hearing testimony and the medical evidence of record (including the evidence regarding Adams' colostomy closure and wound infection) and provided a number of specific reasons for finding Adams to be less than fully credible, none of which are specifically challenged herein.

Accordingly, and for all the reasons set forth above, Adams' first assignment of error is without merit.

### Consultative Examiner Dr. House

In her second assignment of error, Adams argues the ALJ failed to properly evaluate the opinion of psychological consultative examiner, Dr. House.  She maintains the ALJ failed to address certain "critical findings made by Dr. House that prove Ms. Adams' disability," i.e., his opinion that Adams would be disruptive and dysfunctional in the work environment and "likely simply would not show up."  (Tr. 406.)  Adams asserts the ALJ's failure to discuss this particular opinion is reversible error in light of the VE's testimony that all work would be precluded for an individual that would be off task 15 minutes each day; require extra work breaks; or, would be absent two or more days per month. (Doc. No. 13 at 12.)

The Commissioner argues the ALJ reasonably discounted Dr. House's finding that Adams would be disruptive and dysfunctional in the work environment "because it was a current assessment based on only a brief glimpse of Plaintiff's functioning, and was inconsistent with Dr. House's conclusion that Plaintiff's condition was likely to improve with mental health treatment."  (Doc. No. 16 at 15.)  The Commissioner also notes the ALJ's rejection of these

particular opinions is supported by the opinion of state agency psychologist Dr. Tangeman, who expressly indicated that Dr. House's opinion was "an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning."  (Tr. 115.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  *Id*.  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

Here, the ALJ discussed Adams' examination by Dr. House as follows:

> In terms of the claimant's mental impairments, the undersigned recognizes her major depressive disorder and anxiety disorder.  The claimant attended a consultative examination with David V. House, Ph.D., in July 2012, at which point she endorsed psychiatric complications beginning in her 20s.  (Exhibit 9F/3).  She apparently had received treatment, including Zoloft but had not found relief. (Exhibit 9F/3).  Dr. House discussed stressors in the claimant's life, including those related to her family, finances, and health factors.  (Exhibit 9F/3-4).  He then diagnosed the claimant with major depressive disorder and anxiety. (Exhibit 9F/5).  Subsequent medical records indicate that the claimant began taking Xanax.  (Exhibit 12F/5).

(Tr. 15.)  The ALJ then weighed Dr. House's opinion as follows:

> In terms of the claimant's mental impairments, the undersigned grants some weight to Dr. House's examining opinion that the claimant has only a fair

28

> memory and variable concentration. (Exhibit 9F/6-7).  The doctor believed that
> the claimant's mental health prognosis was tied to the treatment she received and
> provided a global assessment of functioning score of 45.  (Exhibit 9F/6).  The
> undersigned affords such scores little weight because they only provide a brief
> glimpse at the claimant's level of functioning.

(Tr. 16.)  The ALJ went on to explain that he accorded "some weight" to Dr. Tangeman's

opinion that Adams is able to complete simple, one to two step tasks, but not work that involves

extended periods of attention, concentration, or more than daily planning.  *Id.*

As noted above, in formulating the RFC, the ALJ included the following mental

limitations: "She has the capacity to complete simple, one to two step tasks.  She has the

capacity to complete tasks that do not involve extended periods of attention, concentration, or

more than daily planning.  She should not be required to influence others to follow instructions,

demands, or handle criticisms.  She has the capacity to complete tasks where there is no more

than occasional change.  When change occurs it must be able to be explained in simple terms."

(Tr. 13.)

The Court finds the ALJ properly evaluated Dr. House's opinion.  As an initial matter, the

Court is not persuaded that Dr. House's opinion that Adams would be "disruptive and

dysfunctional" in the work environment necessarily translates into a finding that she would be

off task 15 minutes each hour, require extra breaks, or miss two or more days of work per month.

Dr. House did not offer an express opinion regarding breaks, predicted absenteeism or the

amount of time Adams would be expected to be off-task.  Nor did he articulate, from a functional

limitation standpoint, how his finding that Adams would be "disruptive and dysfunctional"

would manifest itself in the work place.  Thus, the Court rejects Adams' premise that Dr.

House's "disruptive and dysfunctional" opinion necessarily runs afoul of the VE's testimony.

Even assuming Dr. House did imply some degree of functional limitations regarding

breaks, predicted absences, and/or time spent off-task, the Court finds the ALJ sufficiently

explained his reasons for according only "some weight" to Dr. House's opinion.  As set forth

above, the ALJ discussed Dr. House's examination and acknowledged his opinions regarding

29

Adams' mental limitations. While the decision did not expressly discuss Dr. House's opinion that Adams "would be disruptive and dysfunctional in a work environment," the Commissioner correctly notes that Dr. House expressly qualified that particular opinion by stating that it described Adams' *current* status. (Tr. 406.) Indeed, Dr. House went on to note that Adams "likely would do better as her physical health improves and she receives some further psychological or psychiatric treatment." (Tr. 407.) Though it might have been better practice to provide a more explicit discussion of this particular opinion, the Court finds the ALJ adequately explained his evaluation of this opinion by noting that Dr. House's assessment only provided a "brief glimpse at the claimant's level of functioning." (Tr. 16.)

Thus, the ALJ acknowledged Dr. House's opinion and sufficiently articulated his basis for discounting it. As the Commissioner correctly notes, Dr. House was not Adams' treating physician and, therefore, the ALJ was not required to satisfy the "good reasons" requirement in rejecting his opinion. *See Taylor v. Colvin*, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013) ("Notably, the procedural 'good reasons' requirement does not apply to non-treating physicians"); *Smith v. Comm'r of Soc. Sec*., 482 F.3d 873, 875 (6th Cir. 2007) (explaining that "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting their reports"). The analysis provided by the ALJ satisfies the explanation requirements for non-treating, examining physicians.

Accordingly, the Court finds the ALJ did not err in rejecting Dr. House's opinion that Adams would be "disruptive and dysfunctional in a work environment, at least currently." Adams' second assignment of error is without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision is AFFIRMED.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge

Date: August 5, 2015